[Civ. No. 32394. First Dist., Div. Two. Nov. 19, 1974.]

HAROLD GUTKNECHT, Plaintiff and Appellant, v.
CITY OF SAUSALITO, Defendant and Appellant.

SALT'S OF SAUSALITO, LIMITED, Plaintiff and Appellant, v.
CITY OF SAUSALITO, Defendant and Appellant.

**COUNSEL**

Landels, Ripley & Diamond and Edgar B. Washburn for Plaintiffs and Appellants.

Bagshaw, Martinelli, Corrigan & Jordan and Leland H. Jordan for Defendant and Appellant.

## OPINION

**TAYLOR, P. J.**—These cross-appeals arise from an action by plaintiffs, food take-out businesses,[1] challenging the validity of the City of Sausalito's[2] business license ordinance and seeking refund of the license taxes paid. The trial court upheld the ordinance and denied the refunds, except for that portion resulting from a retroactive application. The Merchants contend that the ordinance is unconstitutional for vagueness and denial of equal protection, and is merely a subterfuge for eliminating them from the City. The City contends that the retroactive aspect of the tax was proper. We conclude that the ordinance is constitutional, and that the retroactivity of the tax was properly limited to the then current tax year.

The City of Sausalito adopted Ordinance No. 716 on August 6, 1968, providing for the licensing of various businesses within the City, and requiring the payment of a license tax prior to issuance of the business license. Although some businesses were charged a flat rate license tax, under section 23 of the ordinance most businesses were required to pay a $25 annual registration fee plus a percentage of gross receipts. The ordinance contained five separate business classifications, and the percentage of gross receipts to be paid by a business establishment as a license tax depended upon its classification. For gross receipts under $500,000 per year, the percentage charged ranged from $.125 per $1,000 gross revenue in Class "E" to $2.50 per $1,000 gross revenue in Class "D." Among the elements considered in determining the tax rates were business profitability, volume and anticipated revenue, and in the case of Class "D," the amount of litter created by the take-out food establishments.

On August 4, 1970, the City adopted Ordinance No. 764, amending the basic business license tax ordinance to increase the tax on take-out food establishments from $2.50 to $52.50 per $1,000 of gross receipts.[3] This in-

---

[1] Hereafter generally referred to as "the Merchants."

[2] Hereafter generally referred to as "the City."

[3] Ordinance No. 764 was actually preceded by Ordinance No. 756, which was passed on April 7, 1970. Ordinance No. 756 imposed a tax on the consumption of take-out food sold within the City. The tax was levied at the rate of 5 percent of the retail sales price, and went into effect immediately upon adoption of the ordinance. The trial transcript indicates that the purpose of the 5 percent tax was to derive revenue which would approximate the cost of cleaning up litter attributable to the take-out food establishments.

On May 14, 1970, the Court of Appeal for the Second District filed its decision in the case of *Century Plaza Hotel Co.* v. *City of Los Angeles*, 7 Cal.App.3d 616 [87 Cal.Rptr. 166], which invalidated a Los Angeles ordinance imposing a 5 percent tax on the consumption of alcoholic beverages. This decision raised a question regarding the validity of the City's take-out food consumption tax. Consequently, on the

crease was intended by the City to recover the portion of the cost of litter removal attributable to take-out food establishments. The ordinance provided that the increase should apply retroactively to April 1, 1970. The Merchants subsequently initiated the present action challenging the validity of Ordinance No. 764.

The Merchants' first contention is that the term "take-out food" is too vague and ambiguous to be valid for taxing purposes.[4]

In a leading case dealing with the concept of vagueness or ambiguity, the United States Supreme Court stated that ". . . a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." (*Connally* v. *General Const. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126].) ■ Civil statutes as well as criminal statutes must be sufficiently clear to provide a standard against which conduct can be uniformly judged by courts and administrative agencies. (*Morrison* v. *State Board of Education*, 1 Cal.3d 214, 231 [82 Cal.Rptr. 175, 461 P.2d 375].)

■ Admittedly, if doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer (*Hassett* v. *Welch* (1938) 303 U.S. 303, 314 [82 L.Ed. 858, 866-867, 58 S.Ct. 559]).

In *Connally, supra,* at pages 391-392 [70 L.Ed. at pages 328-329], the United States Supreme Court stated that "[t]he question whether given legislative enactments have been thus wanting in certainty has frequently been before this court. In some of the cases the statutes involved were upheld; in others, declared invalid. The precise point of differentiation in some instances is not easy of statement. But it will be enough for present purposes to say generally that the decisions of the court upholding statutes as sufficiently certain, rested upon the conclusion that they employed words or phrases having a technical or other special meaning, *well enough known to enable those within their reach to correctly apply them* [citations], or a well-settled common law meaning, notwithstanding an element of degree

---

recommendation of the city attorney, Ordinance No. 756 was repealed on August 4, 1970, and Ordinance No. 764 was enacted to accomplish the same result.

[4]Ordinance No. 716, the basic license ordinance, as amended by Ordinance No. 764, contained the following definition of take-out food: " 'Take-out food sales' are defined as sales of food and/or beverages prepared or served on the premises primarily for consumption off the premises. Take-out food sales shall not include sales of food and/or beverages where the manner of service or packaging or the condition of the food or beverage does not indicate that it is sold primarily for immediate consumption." (§ 23.)

in the definition as to which estimates might differ [citations], or, as broadly stated by Mr. Chief Justice White in *United States* v. *Cohen Grocery Co.*, 255 U.S. 81, 92, 'that, for reasons found to result *either from the text of the statutes involved or the subjects with which they dealt, a standard of some sort was afforded.*' " (Italics added.)

We find appropriate standards in both the test of the ordinance and the common, everyday understanding of the term "take-out food."

■ Ordinance No. 716, as amended by Ordinance No. 764, defines "take-out food" to be all food prepared or served for immediate consumption off the premises. Included in this definition are three factors which must be weighed in the determination of whether the food is sold for immediate consumption. These are:

1) manner of service of the food or beverage;

2) the packaging provided;

3) the condition of the food or beverage.

On examination of Mrs. Wilma S. Young, deputy city clerk in charge of administering the business license tax, the Merchants posed a series of hypothetical questions which generally focused on specific factors, rather than a combination of the three. This approach attempted to fragment the concept of "for immediate consumption off the premises" into a hard test which could be applied in all cases.

■ The requirement for certainty is not intended to demand that statutes be subject to absolute "yes-no" or "on-off" precision. Reasonable certainty is all that is required (*People* v. *Victor*, 62 Cal.2d 280, 300 [42 Cal.Rptr. 199, 398 P.2d 391]). "It is not required that a statute, to be valid, have that degree of exactness which inheres in a mathematical theorem. It is not necessary that a statute furnish detailed plans and specifications of the acts or conduct prohibited. The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding." (*Smith* v. *Peterson*, 131 Cal.App.2d 241, 246 [280 P.2d 522, 49 A.L.R.2d 1194].)

A certain amount of discretion must be exercised by the City administration in determining whether a food product is sold for immediate consumption off the premises. This, however, does not render the ordinance invalid. (Cf. *Henry's Restaurants of Pomona, Inc.* v. *State Bd. of Equalization*, 30 Cal.App.3d 1009, 1020 [106 Cal.Rptr. 867].) ■ We agree with the City that when the record is read in its entirety, there is sufficient evidence to conclude that the three factors, as set forth in Ordi-

nance No. 716, provide a reasonably certain standard by which to judge whether food is "take-out."

We further note that a statute or an ordinance can be sufficiently certain if it employs words of long usage (*Lorenson* v. *Superior Court*, 35 Cal. 2d 49, 60 [216 P.2d 859]) or if the subject matter itself affords some standard (*Connally* v. *General Const., Co., supra*). While the concept of "take-out food" or "fast food" may be a relative newcomer to the American scene, we may take judicial notice (Evid. Code, §§ 452, subd. (g), 459) of the fact that it is now a widespread all-pervasive concept. The term "take-out food" is in common usage, and because of its reference to a particular method or type of food service, has acquired a common understanding. This understanding, along with the basic subject matter to which it refers, lend themselves to a reasonable and practical construction of Ordinance No. 716.

We find further support for this conclusion the case of *Henry's Restaurants of Pomona, Inc.* v. *State Bd. of Equalization,* 30 Cal.App.3d 1009 [106 Cal.Rptr. 867], in which the plaintiff challenged the constitutionality of Revenue and Taxation Code section 6359. Section 6359 generally exempts "food products" for human consumption from taxation, but excludes from the exemption the following: ". . . (c) when the food products are ordinarily sold for immediate consumption on or near a location at which parking facilities are provided primarily for the use of patrons in consuming the products purchased at the location, even though such products are sold on a 'take-out' or 'to-go' order and are actually packaged or wrapped and taken from the premises of the retailer . . . ."

While the court was not called upon to rule on the certainty of the term "take-out food," it is used by the court throughout the opinion. Reference is made to "take-out" customers, "take-out" sales, and "take-out" food. If the term is inherently ambiguous, it is doubtful that the court would have used it with such facility. We likewise have no trouble with the term and regard it as sufficiently clear and unambiguous. We further note that the court specifically had no problem with the term "immediate consumption," which is also a key term in the instant case.

As was stated in *Henry's Restaurants, supra,* "The section appears reasonably to facilitate the efficient collection of tax. . . .

"[The City] . . . was not required to be totally omniscient in writing a statute which would meet all claims of inequality, particularly in such a rapidly evolving field as food purveying." (*Supra,* at pp. 1017-1018.)

We conclude that the term "take-out food" as defined by the taxing ordinance is sufficiently certain to meet constitutional standards.

The Merchants' remaining arguments generally challenge the "D" classification per se, and the rate structure as applied to the take-out food businesses in relation to other businesses. In essence, the arguments claim that separate classification of take-out food businesses denies the Merchants equal protection of the laws, that the tax-rate structure as applied to them is unreasonable, arbitrary and discriminatory, and that the tax rate, as applied to them, is confiscatory and is a subterfuge for the true City purpose of eliminating take-out food establishments from the City.

We initially note that the City's Business License Tax Ordinance is expressed as a revenue measure rather than a regulatory measure. Ordinance No. 716, section 2, states that "this ordinance is enacted solely to raise revenue for municipal purposes, and is not intended for regulation." A proviso is added which allows for license revocation under circumstances specified in section 28. However, section 28 makes it clear that the license may not be revoked for the purpose of regulation. While the title of an ordinance is not conclusive, we note that this particular ordinance is void of regulatory provisions. "Taking into consideration the absence of regulatory provisions, the amount of the several taxes imposed, and the nature of many of the subjects of taxation named in the ordinance, including the particular business here involved, it is very clear that the license-tax upon the business alleged to be conducted by petitioner was imposed solely for the purpose of raising revenue." (*Ex parte Braun*, 141 Cal. 204, 206 [74 P. 780]; *In re Johnson*, 47 Cal.App. 465, 466-467 [190 P. 852].) The Merchants' contention that the City had ample alternative means at hand for regulation is not material to this case.

Preliminarily, we set forth the well established principles of law governing classification for the purpose of taxation. As this court (Division One) noted in the case of *Clark* v. *City of San Pablo*, 270 Cal.App.2d 121, 126-127 [75 Cal.Rptr. 726]: " 'It is well settled that occupations and businesses may be classified and subdivided for purposes of taxation, and it is within the discretion of the Legislature to exact different license taxes from different classes or subclasses of businesses, subject only to the limitations of the state and federal Constitutions in regard to equal protection of the laws. No constitutional rights are violated if the burden of the license tax falls equally upon all members of a class, though other classes have lighter burdens or are wholly exempt, provided that the classification is reasonable, based on substantial differences between the pursuits separately grouped, and is not arbitrary. [Citations.]'

"Conversely, it has been stated, 'It is elementary that there must be equality and uniformity in the imposition of license-taxes for revenue purposes, and that any classification providing different charges for those engaged in the same business, a charge for some and exemption for the others, must be one founded upon some natural and reasonable distinction pertinent to the matter.' [Citations.]

"In the application of these mutually exclusive principles, the city is aided by the following doctrine, 'When a legislative classification is questioned, if facts reasonably can be conceived that would sustain it, their existence is presumed, and the burden of showing arbitrary action rests upon the one who assails the classification. [Citations.]' . . . Nevertheless, the burden so imposed 'does not mean that the court must shut its ears to reason and declare in every case that *because* an ordinance has been passed there must be valid reasons for its existence.' [Citation.]" (*Web Service Co.* v. *Spencer,* 252 Cal.App.2d 827 [61 Cal.Rptr. 493]; *City of San Mateo* v. *Mullin,* 59 Cal.App.2d 652 [139 P.2d 351].)

In the present case, the City has established a "class" of business establishments which is then further divided into subclasses, i.e., business license tax categories "A" through "D." "It is recognized that a legislative body may classify and subdivide classes within those engaged in one generic field of activity where there is a *reasonable basis for such action* [citations]." (*Clark* v. *City of San Pablo, supra,* at p. 131; italics added.)

The Merchants assert that the classification per se is unconstitutional because there is no "reasonable basis" for it. We do not agree. "Among classifications that have been upheld by the courts are those based on . . . the *character of goods or products dealt in or sold* . . . . In some instances, differences in methods and procedures used in conducting businesses that are otherwise of the same general character may afford an acceptable basis of distinction between classes established in legislation imposing license charges . . . ." (51 Am.Jur.2d, Licenses and Permits, § 29; see also, *Web Service Co.* v. *Spencer,* 252 Cal.App.2d 827, 834 [61 Cal.Rptr. 493]; *City of San Mateo* v. *Mullin,* 59 Cal.App.2d 652, 655-656 [139 P.2d 351].) In the instant case, the record supplies ample evidence indicating that, in addition to the general considerations of profitability and volume, specific consideration was given to the additional burden upon the City created by the manner in which the Merchants conducted their businesses and by the nature of the products purveyed, particularly in relation to the litter problem.

*Fox etc. Corp.* v. *City of Bakersfield,* 36 Cal.2d 136 [222 P.2d 879], is clearly in point. The City of Bakersfield had for many years a basic business

license tax ordinance which levied a tax for the purpose of revenue rather than regulation. Sometime after enactment of the basic license tax ordinance, the city, by initiative measure, passed an additional license ordinance which taxed establishments furnishing amusement or entertainment in the city. The tax was on the privilege of conducting such places of business, and was expressly in addition to rather than in lieu of the other taxes. Fox challenged the constitutionality of the ordinance, alleging, among other things, that the classification was improper and that it was being denied equal protection of the laws.

The court extensively discussed the traditional presumptions in favor of the validity of the ordinance, and declared it to be well settled that occupations and businesses may be classified and subdivided for purposes of taxation, so long as founded on natural, intrinsic or fundamental distinctions which are reasonable in their relation to the object of the legislation.

In concluding that the amusement classification was proper, the Supreme Court in *Fox* noted that "[a]mong other things, one of the main features of the tax is that it is imposed on those amusement businesses charging admission, and *those taxed are the ones where larger groups of people are likely to gather, with the accompanying effects on the functioning and activities of the government.*" (*Id.* at p. 144; italics added.)

*Associated Home Builders etc., Inc.* v. *City of Newark,* 18 Cal.App.3d 107 [95 Cal.Rptr. 648], dealt with a city license tax imposed on the business of constructing dwellings. When the tax was challenged as unconstitutional, this court (Division Three) declared that ". . . when a legislative enactment is attacked as violative of the equal protection clause, 'if facts reasonably can be conceived that would sustain it, their existence is presumed, and the burden of showing arbitrary action rests upon the one who assails the classification.' [Citation.]" (*Id.* at p. 109.) The city justified the classification and tax on the basis of the relatively greater fire and police protection and street use burdens resulting from the additional residents brought into the city by the dwelling construction. "The fact issue [of the burden] is for the legislative body, and *its determination affords an adequate basis for the classification.*" (*Id.* at p. 110; italics added.)

In summary, legislative classifications come to this court with a presumption of validity. This presumption is, of course, not conclusive. A valid classification for revenue purposes must be based on natural distinctions inherent in the class, and these distinctions must be reasonably related to the object of the legislation. Natural distinctions have been found with respect to both the character of goods or products sold and the methods

or procedures used in conducting the business. A "reasonable relation" has been found to exist where the object of the taxation creates a particular burden upon the community (*Fox, supra,* and *Associated Home Builders, supra*).

■  In the present case, we find a natural distinction between take-out food purveyors and other businesses based both on the product and the method of conducting the business. The record contains extensive evidence indicating that take-out food businesses create a substantial litter burden upon the City. The revenue measure was intended to meet that burden, hence there is a reasonable relationship between the distinct class and the object of the legislation. We conclude that there is nothing unconstitutional, per se, in the classification created by Ordinance No. 716 as amended by Ordinance No. 764.

The Merchants further contend that the *rate structure,* as applied to Class "D" relative to other classes, is discriminatory. While we have established that take-out food establishments have inherent distinctions which are reasonably related to the object of the revenue measure, the question remains as to whether the ordinance is sufficiently comprehensive to include other businesses similarly situated.

Although stated in different ways by the Merchants, their arguments can be reduced to the simple proposition that " '[t]he legislature has absolutely no power to classify persons . . . engaged in precisely the same occupation, laying a tax upon some of them and excepting others . . .'

"This ordinance, therefore, is unjust and discriminatory in . . . imposing upon a part of a class artificially created, a burden not imposed upon all who stand in the same relation to the same subject-matter" (*City of Los Angeles* v. *Lankershim*, 160 Cal. 800, 804 [118 P. 215]). The Merchants claim that they are paying a disproportionate share of the license tax burden, and that it is discriminatory for the City to consider the litter burden in establishing the Class "D" rate while it does not consider this burden relative to other classes.

The assertion that the Merchants were paying a large proportion of the business license taxes was disposed of in *Fox Theatre, supra,* at page 139. "[T]he amount of taxes paid . . . is not a ground for invalidating the tax, at least unless it reaches the confiscatory or prohibitory point or completely refutes any basis for a classification. Plainly there is discrimination in the taxes imposed by [the] ordinance . . . for it does not apply to all businesses operated in the city. That premise also embraces the fact that plaintiffs bear a greater burden of the taxes than other businesses. The issue is

one of whether the classification made by [the] ordinance . . . is proper. The law is not, as plaintiffs suggest, that there is a requirement of reasonableness of amount of excise taxes levied for revenue by a municipal corporation . . . ." ■ In this case, we find nothing in the tax rate to refute the valid classification of take-out food establishments, particularly in light of the fact that the revenue produced was approximately equal to the calculated burden. Moreover, we find nothing in the record to support the contention that the tax rate is confiscatory or that the tax rate is merely a subterfuge for driving the Merchants out of the City.

The Merchants contend it to be a denial of equal protection for them to be the only business classification taxed partially on the basis of litter burden. If the object of the revenue measure was to obtain sufficient funds to remove *all litter* from the City streets, the Merchants' contention may have had considerable merit. However, ample evidence in the record demonstrates that this was not the purpose intended by the City. The trial court ascertained that the total cost of cleaning up all litter in the City during the relevant periods of time was between $30,000 and $40,000 per year, and the cost of removing litter attributable to take-out food establishments was between $15,000 and $30,000 per year. The record shows that the City estimated that $20,600 would be derived from the new ordinance and actual income proved to be within $200 of that estimate. Clearly, if the City had intended the Merchants to pay the full cost of litter removed, they would have established a rate sufficient to generate the full $40,000.

Since the legislative intent was to generate revenue in an amount sufficient to cover only that portion of litter removed attributable to the take-out food establishments, we find nothing discriminatory in the omission of that factor in taxing other classifications. Furthermore, other businesses also bear a portion of the litter burden. Class "D" tax accounts for approximately 50 percent of the monies expended for litter removal, with the remaining 50 percent presumably being charged against the City's general operating funds. These funds are derived from many sources, *including* the business license taxes paid by other business categories.[5]

It is also maintained by the Merchants that the ordinance is under-inclusive either by design or by application, as some food related litter is not taken into consideration by the tax structure, and some establishments are not similarly taxed although they engage in take-out food distribution.

---

[5]Merchants in the City who sold take-out food in addition to other types of merchandise were subject to the "D" rate only to the extent of their take-out food revenue.

As to the candy bar wrappers, cited as an example in the first category of excluded food related litter, we agree with the City's contention that there is nothing in the manner of service, the packaging, or the condition of a candy bar which indicates that it is sold primarily for *immediate consumption* off the premises. Hence, a candy bar is not a take-out food item, and not a proper item for taxation under this ordinance. The same reasoning applies to the other examples cited by the Merchants in the first category. The City did not intend to cover every single type or source of food-related litter; to do so would be impractical, if not impossible, and thus would be patently unreasonable.

As to the individual pizzas served at a third floor stand-up kiosk, the record indicates that they were sold on ceramic plates. The beer sold was in open bottles, and customers were not permitted to take the food into any other shop within the same building complex. Certainly, these factors indicate that the food was sold for immediate consumption *on* the premises and therefore was not properly classified as take-out food.[6]

While the record revealed some instances of business establishments selling take-out food which were not taxed in the "D" classification, these resulted from lax enforcement, rather than from intentional and arbitrary discrimination. The law does not demand that enforcement be perfect. Slight unequal applications do not constitute a denial of equal protection unless an element of intentional or purposeful discrimination is shown (*In re Finn,* 54 Cal.2d 807 [8 Cal.Rptr. 741, 356 P.2d 685]; *People v. Thompson,* 10 Cal.App.3d 129, 134 [88 Cal.Rptr. 753]). Of course, if enforcement becomes totally lax, an inference could be drawn that the ordinance was intended to discriminate against take-out food merchants, either in concept or in application. It is, therefore, incumbent upon the City to exercise due care in enforcing the taxing ordinance. However, in the instant case, we find no intentional or purposeful discrimination on the part of the City, and we hold that the ordinance, as applied, does not deny the Merchants equal protection.

The City has challenged the lower court's limitation on the retroactive application of Ordinance No. 764. The Sausalito business license tax year begins on July 1 of the calendar year, and by making the ordinance retroactive to April 1, 1970, the City changed the tax rate for a portion of the previous tax year. The trial court upheld the retroactive

---

[6]The Merchants further contend that they don't litter, rather, the tourists do. While this may be technically true, it remains that but for the take-out food purveyors, there could be no take-out food litter. We find this technical distinction to be without merit (cf. *Fox, supra,* and *Associated Home Builders, supra*).

application to July 1, 1970, but invalidated the retroactive application to the prior year.

Our courts have upheld the retroactive application of tax laws only where such retroactivity was limited to the current tax year (see e.g., *Fullerton Oil Co.* v. *Johnson,* 2 Cal.2d 162, 176 [39 P.2d 796]; *Holmes* v. *McColgan,* 17 Cal.2d 426, 430 [110 P.2d 428]; *Western & Southern Life Ins. Co.* v. *State Bd. of Equalization,* 4 Cal.App.3d 21, 34 [84 Cal.Rptr. 88]; *Sunset Nut Shell. Co.* v. *Johnson,* 49 Cal.App.2d 354, 357-359 [121 P.2d 849]; *American States W. S. Co.* v. *Johnson,* 31 Cal.App.2d 606, 613-618 [88 P.2d 770]). In *Allen* v. *Franchise Tax Board,* 39 Cal.2d 109, 114 [245 P.2d 297], the California Supreme Court stated that while "[w]e are not here concerned with the question whether the Legislature may change the rate of the tax after the close of the taxable year . . . [i]t may be assumed that under the state organic law *changes in the rates may be enacted only in the taxable year to which they apply.*" (Italics added.) We conclude that the trial court properly determined that the retroactive application of the license tax was invalid for the period of April 1, 1970, to June 30, 1970.

The judgment is affirmed. Each party is to bear its own costs on appeal.

Kane, J., and Rouse, J., concurred.