[Civ. No. 39970. Second Dist., Div. Two. Mar. 5, 1973.]

HENRY'S RESTAURANTS OF POMONA, INC., et al.,
Plaintiffs and Respondents, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

(Consolidated Cases.)

## COUNSEL

Evelle J. Younger, Attorney General, and Philip C. Griffin, Deputy Attorney General, for Defendant and Appellant.

Fizzolio & Fizzolio, Rubenstein & Hawkins, James M. Fizzolio and Carl Q. Christol for Plaintiffs and Respondents.

## OPINION

**COMPTON, J.**—In these five consolidated actions certain restaurant owners (plaintiffs) sought to recover sales taxes paid under protest on sales claimed by them to be exempted by section 6359 of the Revenue and Taxation Code.

Each plaintiff conducts an eating establishment which combines the usual "sit down" restaurant operation with a "carhop" drive-in restaurant. These establishments sell prepared food for consumption on the premises as well as for "take out" or "to go" orders. Each operation provides parking spaces for patrons with certain spaces reserved for drive-in customers and the remainder set aside for restaurant patrons.

At the time of commencement of the actions, Revenue and Taxation Code section 6359 generally exempted from taxation "food products" for human consumption but excluded from the exemption the following situations:

"(a) when the food products *are served as meals* on or off the premises of the retailer, *or* (b) when the food products *are furnished, prepared, or served for consumption at tables, chairs, or counters or from trays, glasses, dishes, or other tableware* whether provided by the retailer or by a person with whom the retailer contracts to furnish, prepare, or serve food products to others, *or* (c) *when the food products are ordinarily sold for immediate consumption on or near a location at which parking facilities are provided primarily for the use of patrons in consuming the products purchased at the location, even though such products are sold on a "take out" or "to go" order and are actually packaged or wrapped and taken from the premises of the retailer, or* (d) *when the food products are sold for consumption within a place, the entrance to which is subject to an admission charge,* except for national and state parks and monuments, . . ." (Italics added.)

The California State Board of Equalization (the Board) appeals from a judgment for plaintiffs which decreed inter alia that section 6359, subdivision (c), together with the Board's manner of administration thereof, is unconstitutional as a violation of the Fourteenth Amendment to the United States Constitution, and article I, section 13 of the California Constitution in that it was unconstitutionally vague and arbitrarily and unreasonably discriminated between drive-in food service establishments and conventional restaurants.

Subdivision (c) was added to the statute in 1963. Prior to 1963, exemption from the tax was denied only to products served as meals either on or off the premises of the retailer, or drinks or foods furnished, prepared or served for consumption at tables, chairs or counters or from trays, glasses, dishes or other tableware provided by the retailer. Thus both the typical restaurant sale and the typical drive-in sale were taxed alike. On the other hand, sales of "take out" food by any type of food establishment, including a drive-in, were exempted from tax.

As early as 1953, the Board noted that the activities and serving methods of drive-in food establishments were changing. The drive-in with the familiar "carhop" and window tray was giving way to an operation where the customers would obtain the food from a window or counter and return

to their cars to eat or drive off to eat elsewhere. Oftentimes this food would be served with paper and cardboard tableware.

The Board took the position that there was no basic difference, insofar as sales tax was concerned, between the traditional drive-in and these newer self-service operations. Thus on November 12, 1953, the Board issued a General Sales Tax Bulletin which declared that a retailer operating a "drive-in" or similar establishment was subject to the sales tax if the food was consumed on or adjacent to the premises whether in an automobile or otherwise, or if he provided food for consumption from disposable tableware regardless of where the consumption occurred.

Later, in the next month, another General Sales Tax Bulletin interpreted the previous bulletin to apply only to a drive-in or similar establishment. The key factor in the definition of a drive-in was the availability of parking space for the use of patrons who there consumed the food and drink purchased at the establishment. Excluded from the application were "drive-in theatres, mobile lunch wagons, establishments catering only to walk-up trade, sellers exclusively of box lunches or food in cartons or other containers for consumption away from the premises, stands in markets or stores, even though some patrons may consume food purchased in cars parked in parking areas maintained by the market or store for its general patrons, and establishments fronting on a public street where patrons may park their cars at the curb and consume the food purchased, but which parking space is available to the public and is not under the control of the operator."

Under this bulletin operators of the affected drive-ins were still exempt as to "take out" food which was consumed away from their premises and for which no tableware, etc., was furnished. Such exemptions could only be claimed, however, by furnishing either sales checks or receipts or some other adequate auditable record.

Following the promulgation of these bulletins, according to the Board, there was widespread confusion in the drive-in world. Operators were unable to substantiate their exemptions for "take out" sales because customers refused to cooperate. Not only did some customers protest sales tax but adopted means of thwarting its collection. The ordering of food-to-go (tax free) followed by consumption of the food on the premises became a common event.

Certain retailers collected tax on all sales and claimed no food deduc-

tion. This resulted in complaints by legitimate "take out" customers that they were being taxed on tax exempt sales.

Audits by the Board were abetted by observations of sales at test locations. An estimate of tax liability was then based on these tests. Those operators who had an inadequate recording system for recording "take out" sales were penalized when they could not substantiate sufficient "take out" sales to meet the percentage set by the auditors' test results.

Some retailers elected to pay sales tax based on their own estimates of "take out" sales only to have their estimates rejected by the auditors. Aside from difficulty in record keeping, many operators could not determine at the time of delivery whether a customer would consume the food on the premises or drive elsewhere. This was particularly true with the "drive-through" drive-in where customers would drive up to a window, collect their food and then either leave the area or decide to park in one of the parking spaces provided on the premises. Apparently inquiry of the customer's intent proved futile in many cases or was obviously impractical in the rush of business.

As an answer to the problem described by the Board, the Legislature in 1963 enacted subdivision (c) of section 6359, *supra.* In addition to the previous conditions of taxability, i.e., service of meals or the furnishing of food products for consumption from tableware, the Legislature added another, the availability of parking facilities for the use of patrons in consuming the products purchased at the location when those products were capable of immediate consumption.

Thus certain types of "take out" food, whether consumed on the premises or not, were taxable if purchased at a drive-in type of operation but were not taxable if purchased at a conventional restaurant or an establishment without parking facilities. Herein lies the crux of plaintiffs' complaint of discrimination.

The Board did take cognizance of the problem of the sale by drive-ins of food in quantities and in a form obviously not intended for immediate consumption, and adopted the policy that taxation of such items as ice cream in pints, milk in quarts, bags of dozens of hamburgers, whole pies and cakes, etc., was not intended by the statute and would improperly discriminate in favor of bakeries, restaurants or other retail food outlets. The Board sought to solve this problem by a ruling setting forth a "bulk sale" test which permitted the drive-in operator to claim an exemption for

sales of food in bulk containers or in a quantity obviously not intended for consumption on the premises.

The specific dimensions of a sale in bulk were not spelled out in the ruling, but were instead left to the discretion of the Board's field staff which was presumably better able to gauge a bulk sale by observation of each individual operation and the circumstances under which the sale was made.

While in practice bulk sales were tested by various formulae in the several Board districts throughout the state, the statewide requirements as to what constituted acceptable records to support a tax exemption were specifically and uniformly established by a general tax bulletin published by the Board.

We start with the proposition that the statute comes before us clothed with a presumption of constitutionality.

"[T]he power of the states to make classifications of persons or property for the purpose of taxation is very broad. . . . If a classification of persons or occupations made for the purpose of imposing taxes is founded on natural, intrinsic or fundamental distinctions which are reasonable in their relation to the object of the legislation and otherwise, it will be deemed to be valid . . . ." (*Roth Drug, Inc.* v. *Johnson*, 13 Cal.App. 2d 720, at p. 733 [57 P.2d 1022]; see also *Fox, etc. Corp.* v. *City of Bakersfield*, 36 Cal.2d 136 [222 P.2d 879]; *Garrett Corp.* v. *State Board of Equal.*, 189 Cal.App.2d 504 [11 Cal.Rptr. 421]; *Abrams* v. *San Francisco*, 48 Cal.App.2d 1 [119 P.2d 197].)

"Neither due process nor equal protection imposes upon a state any rigid rule of the equality of taxation. . . . A Legislature is not bound to tax every member of a class or none. It may make distinctions . . . having a rational basis, and . . . they must be presumed to rest on that basis if there is any conceivable state of facts which would support it." (*Carmichael* v. *Southern Coal Co.*, 301 U.S. 495, at p. 509 [81 L.Ed. 1245, 1253, 57 S.Ct. 868, 109 A.L.R. 1327]; see also *Stevens* v. *Watson*, 16 Cal.App.3d 629 [94 Cal.Rptr. 190]; *People* v. *Herbert's of Los Angeles, Inc.*, 3 Cal.App.2d 482 [39 P.2d 829].)

The statute under scrutiny must be viewed against the foregoing constitutional precepts. On its face it purports to impose a tax upon all food products ordinarily sold for immediate consumption on or near a location at which parking facilities are provided primarily for the ease of patrons in consuming the products purchased at the location.

The key phrases are "immediate consumption" and "parking facilities." The former emanated from a legislative desire to equalize competition and tax burden between conventional restaurants and the newly evolving forms of eating establishments by recognizing that meals were partaken in both kinds of places and that meals in either place ought to be equally taxed. The latter phrase narrowed the objects of the tax to drive-in restaurants where food was consumed in a manner similar to formal sitdown restaurants albeit while seated inside one's own car rather than inside a restaurant. The section appears reasonably to facilitate the efficient collection of tax and to equalize the competitive posture of these new forms of motor-age restaurants with that of the older more conventional type of restaurant.

Drive-ins are a unique food-purveying operation differing from the conventional restaurant on the one hand and the take out food section of a market or grocery store on the other.

The legislative determination as to what is a sufficient distinction to warrant a classification will not be overthrown unless it is palpably arbitrary. (*Western Indemnity Co.* v. *Pillsbury*, 170 Cal. 686, 702 [151 P. 398]; *McGowan* v. *Maryland*, 366 U.S. 420 [6 L.Ed.2d 393, 81 S.Ct. 1101]; *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U.S. 61 [55 L.Ed. 369, 31 S.Ct. 337].)

A 1971 amendment to Revenue and Taxation Code section 6359 retained subdivision (c) but added (e)[1] which removed "Hot Prepared

---

[1]Revenue and Taxation Code section 6359, subdivision (e), provides: ". . . or (e) when the food products are sold as hot prepared food products. 'Hot prepared food products,' for the purposes of subdivision (e), include a combination of hot and cold food items or components where a single price has been established for the combination and the food products are sold in such combination, such as a hot meal, a hot specialty dish or serving, or a hot sandwich or a hot pizza, including any cold components or side items. Subdivision (e) shall not apply to a sale for a separate price of bakery goods or beverages (other than bouillon, consommé, or soup), or where the food product is purchased cold or frozen; 'hot prepared food products' means those products, items or components which have been prepared for sale in a heated condition and which are sold at any temperature which is higher than the air temperature of the room or place where they are sold."

"Note-Stats. 1971, ch. 1741, effective December 14, 1971, operative January 1, 1972, also provides: § 24. The purpose of Section 2 of this act is to overcome the present inequities which exist under the California Sales and Use Tax Law with respect to hot food products. Such food products are subject to tax when served in a restaurant. Many of the same items sold as main courses at restaurants and drive-ins, such as hot fried chicken and barbecued spareribs, are also sold on a take-out basis at a variety of specialty shops and are not subject to tax. This phase of the prepared food industry has grown immensely in recent years and represents direct

Food Products" from exemption. Plaintiffs point to this amendment and the accompanying statement of purpose as a recognition by the Legislature of existing inequities.

While that amendment sought to and may be the answer to some problems in the future it does not provide a basis for plaintiffs' claim here.

When in 1963 the Legislature was moving to cure the ill of competitive advantage by plugging a sales tax "loophole," it was not required to be totally omniscient in writing a statute which would meet all claims of inequality, particularly in such a rapidly evolving field as food purveying.

"The Court more than once has said that state legislative reform by way of classification is not to be invalidated merely because the legislature moves one step at a time." (*Schilb* v. *Kuebel*, 404 U.S. 357, at p. 364 [30 L.Ed.2d 502, 510, 92 S.Ct. 479].)

"The prohibition of the Equal Protection Clause goes no further than the invidious discrimination." (*Williamson* v. *Lee Optical Co.*, 348 U.S. 483, at p. 489 [99 L.Ed. 563, 573, 75 S.Ct. 461].)

Plaintiffs make the additional argument that since facilitation of the collection of the tax was a primary purpose of the 1963 amendment and since no difficulty had been experienced by the Board in collecting from "carhop" drive-in operations, they were not intended to be included in the sweep of the statute. In essence, they say that the combination of "carhop" control and accurate record keeping compares more to the conventional restaurant than the self-service drive-in operation at which the statute is aimed. The answer to this contention is that while it is possible that the Legislature had such a distinction in mind, it nevertheless used language in section 6359, subdivision (c), which clearly embraces plaintiffs' type of operation.

---

competition to the taxable sales of restaurants and drive-ins where hot food is taxable. Section 2 will improve the neutrality of the sales tax by providing that all hot food, regardless of the nature of the outlet selling it, will be subject to tax. Section 2 of this act shall not be construed so as to tax gross receipts from the sale, storage, use or other consumption of 'hot food products' served to passengers by an air carrier engaged in interstate commerce. [¶] Further, it is the intent of the Legislature that a combination of hot and cold food products for which a single price has been established shall be taxable if such food products were, in fact, sold as a combination for which the retailer has established a single price. Tax shall not apply, however, merely because a combination of products are purchased if they are not sold as a combination for which a single price has been established. The usual and customary practice of the general public will be considered in determining whether or not a number of food products are sold as a combination or are sold as individual items."

While drive-ins bear a certain similarity to the conventional restaurant they present a unique problem for application of the sales tax to "take out" food.

In both the conventional restaurant and the drive-in, food is served in a prepared condition making it ready for consumption on the premises and the available facilities make that consumption possible.

On the other hand. in the conventional restaurant the true "take out" order is easily identified and the on-premises consumption of such orders is minimized by the very nature of the premises. In the case of the drive-in the "take out" package is delivered to the cars by a "carhop" or by the customer himself, the opportunity for consumption on the premises is great and the control is difficult.

Thus it was perfectly proper for the Legislature in the case of drive-ins. to ignore the fact that some "take out" orders would not be consumed on the premises and simply tax on the basis of the available facilities. The fact that a "carhop" drive-in might be more easily controlled than the self-service drive-in, did not make it mandatory that the Legislature treat these two operations differently.

It is clear that the basic legislative intent is to distinguish between the sale of food in the context of a market and the sale of food by a restaurant or caterer.

While all of the various types of operations which might be included in the latter category constitute a class which is in the general field of food purveying, it is constitutionally permissible for the Legislature to subdivide the class on the basis of the tax collectibility problem created by the particular method of operation adopted by the taxpayer. ■ In reality, the sales tax is not a tax on sales but is an excise tax for the privilege of conducting business measured by gross receipts from sales. (*Roth Drug, Inc.* v. *Johnson,* 13 Cal.App.2d 720 [57 P.2d 1022]; *Livingston Rock & Gravel Co.* v. *De Salvo,* 136 Cal.App.2d 156 [288 P.2d 317]; 43 Cal. Jur.2d. § 8, p. 343.)

■ The trial court found section 6359, subdivision (c), of the Revenue and Taxation Code to be invalid for uncertainty and vagueness which in turn has resulted in improper administration by the Board in its promulgation of the "bulk sale" test and its failure to specifically define the terms "drive-in" and "bulk sale." The regulation, according to the trial court, enlarged on and amended the statute. The court derived its

view of the statute's invalidity from a focus on the regulation. We must in the first instance. however. examine the statute itself to determine its validity.

■ A statute is fatally vague when it exposes a potential actor to some risk or detriment without giving him fair warning. (*Rowan* v. *Post Office Dept.*, 397 U.S. 728. at p. 740 [25 L.Ed.2d 736. 745. 90 S.Ct. 1484].)

■ To be valid the statute must prescribe a standard sufficiently definite to be understandable to the average person who desires to comply therewith. It need not specify and particularize the exact norm, but it must contain language that has a definite meaning established by common law. recognized precedents or trade, or technical usage. (*A. B. Small Co.* v. *American Sugar Refining Co.*, 267 U.S. 233 [69 L.Ed. 589. 45 S.Ct. 295]: *Connally* v. *General Construction Co.*, 269 U.S. 385 [70 L.Ed. 322. 46 S.Ct. 126].) The language of Revenue and Taxation Code section 6359. subdivision (c). meets such a test.

■ With respect to the alleged failure of the Board to supply in its regulation a definition of a "drive-in," it may be noted that the statute does not use the word "drive-in" as such. It merely describes an eating establishment where food is ordinarily sold for immediate consumption and which furnishes parking facilities. The tax then is applied to establishments fitting this description. The label "drive-in" is not an operative word in the statute but merely a handy expression used in the regulation to denominate the sort of operation which the statute seeks to impact. No additional definition of the word "drive-in" is necessary.

As with the word "drive-in," the words "bulk sale" are not key words. The key words are the same as those used in the statute, "ordinarily sold for immediate consumption." "Bulk sale" is merely the descriptive label for the operative words of the statute and regulation.

■ The Legislature has delegated to the Board the duty of enforcing the sales tax law, and the authority to prescribe and adopt rules and regulations. (Rev. & Tax. Code. §§ 7051, 7052.)

■ Such delegation is proper even though it confers some degree of discretion on the administrative body. So long as that discretion is executed within the scope of the controlling statute, it will not be disturbed by the courts. (*Am. Distilling Co.* v. *St. Bd. of Equalization*, 55 Cal.App.2d 799 [131 P.2d 609]: *Leftridge* v. *City of Sacramento*, 59 Cal.App.2d 516 [139 P.2d 112]: *Cal. Drive-In Restaurant Assn.* v. *Clark*, 22 Cal.2d

287 [140 P.2d 657, 147 A.L.R. 1028]; *Metropolitan Water Dist.* v. *Whitsett,* 215 Cal. 400 [10 P.2d 751].)

The regulation here is a permissible exercise of administrative discretion in carrying out the intent of the Legislature. It merely serves as a guide to the Board's staff and taxpayers alike by describing, in an intelligible fashion, the exemption from taxation which the statute provides for sales of products "not ordinarily sold for immediate consumption." The Legislature impliedly approved the Board's previous interpretation of the statute by its enactment of subdivision (e) without any amendment of the other existing provisions in Revenue and Taxation Code section 6359. (*Universal Eng. Co.* v. *Board of Equalization,* 118 Cal.App.2d 36 [256 P.2d 1059]; *Coca-Cola Co.* v. *State Bd. of Equalization,* 25 Cal.2d 918, 921 [156 P.2d 1].)

In sum, neither the regulation nor the various formulae used to identify "bulk sales" can be characterized as arbitrary, capricious or patently unreasonable. Thus the weight of the authorities enjoins any further incursion by the court into the Board's exercise of the authority delegated to it by the Legislature. (*Jersey Maid Milk Products Co.* v. *Brock,* 13 Cal.2d 620 [91 P.2d 775]; *East Bay M.U. Dist.* v. *Dept. of P. Wks.,* 1 Cal.2d 476 [35 P.2d 1027]; *Ralphs Grocery Co.* v. *Reimel,* 69 Cal.2d 172 [70 Cal. Rptr. 407, 444 P.2d 79].)

The judgment is reversed and the trial court is directed to enter judgment for defendant State Board of Equalization.

Roth, P. J., and Herndon, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied May 16, 1973.